CITY OF JERSEY CITY, PROSECUTOR-APPELLANT, v. STATE WATER POLICY COMMISSION AND OAK RIDGE LAKE PARK REALTY COMPANY, INCORPORATED, A BODY CORPORATE, DEFENDANTS-RESPONDENTS.

Argued May 25, 1936—Decided March 25, 1937.

For the appellant, *James A. Hamill* (*Charles A. Rooney*, of counsel).

For the respondent State Water Policy Commission, *David T. Wilentz,* attorney-general, and *Robert Peacock,* assistant attorney-general.

For the respondent Oak Ridge Lake Park Realty Company, Incorporated, *King & Vogt* (*Harry V. Osborne* and *Harold A. Price,* of counsel).

The opinion of the court was delivered by

HEHER, J. It is evident that the state water policy commission labored under a misapprehension of the nature and extent of its statutory power in relation to the subject-matter of the proceedings under review.

The question of the scope of the commission's jurisdiction was raised at the outset, and an adjournment was taken to afford the body an opportunity to consult the attorney-general. Upon the resumption of the hearing, the chairman disclosed the attorney-general had advised that the commission's jurisdiction was confined to the imposition of "such conditions, if any, as are necessary to preserve the channel and provide for the flow of water therein to safeguard the public against danger from the water impounded or affected by the structure," and that "the contamination of such water, after impounding, is for departments other than yours." He thereupon announced that the commission, in accordance with the opinion thus rendered, had determined it lacked jurisdiction of "the question of the sanitary condition of water, except as the taking of that water may affect such condition if an unusual or unwarranted draught is permitted upon any stream or source of supply by this commission."

We consider this to be a fundamental misconception of the expressed legislative policy.

The basic purpose of chapter 243 of the laws of 1912 (*Pamph. L., p.* 437), as amended by chapter 39 of the laws

of 1928 (*Pamph. L., p.* 95), was to invest the State Water Supply Commission (whose functions were, by operation of law, inherited by the present water policy commission) with jurisdiction over dams and reservoirs deemed essential for the "protection of life and property." There was granted an incidental authority to protect the shore land owners against such impairment of their property rights as would result from the destruction or abandonment of a dam or reservoir in existence for a specified period of time.

But chapter 267 of the laws of 1929 (*Pamph. L., p.* 631), as amended, creating and defining the powers of the water policy commission, was, as its title clearly indicates, designed to lay down a broad and comprehensive policy for the conservation and protection of the "surface, subsurface and percolating waters of the state," through control and regulation of the "use, development and diversion" of such waters. The commission was enjoined (section 5) to undertake investigations of the water resources of the state to secure the special objects of legislative solicitude, viz: (a) the supply of pure and wholesome water from water-sheds to municipalities and the inhabitants thereof and the disposal of sewage and wastes which may affect the supply; (b) the prevention of floods; (c) drainage and irrigation; (d) the conservation, development and utilization of water power; and (e) the protection of public navigation.

Potability is the outstanding objective of the special provisions of the statute. The commission is invested (section 7) with "general supervision over all sources of potable and public water supplies, including surface, subsurface and percolating waters, to the end that the same may be economically and prudently developed for public use." The use by a municipality or other civil division of the state, or private interests, of new sources of potable water is conditioned upon the approval of the commission; and it is provided (section 8) that the application therefor shall be accompanied "by such proof as to the character and purity of the water supply proposed to be acquired as the commission shall require." Such approving action is required to be predicated upon a finding, among other things, that the proposed plans "pro-

vide for the proper protection of the supply and the watershed from contamination or provide for the proper filtration of such additional supply." The commission is empowered to impose, in the event of approbation of the application, "such conditions as it may determine should be made therein, to protect the water supply and the interests of the applicant or of the inhabitants of the territory supplied by it with water, or the water supply and interests of any municipal corporation, or other civil division of the state, or the inhabitants thereof, or the water supply and interests of any other person or corporation engaged in supplying water to any municipal corporation or other civil division of the state or the inhabitants thereof; * * * or to make safe all dams or reservoirs to be constructed by said plans." It is generally commanded to "make a reasonable effort to meet the needs of the applicant, with due regard to the actual or prospective needs and interests of all other municipal corporations and civil divisions of the state affected thereby and the inhabitants thereof."

Section 11 enjoins the erection of any structure "within the natural and ordinary high water mark of any stream * * * by any public authority or by any private person or corporation," without compliance with "such conditions" as the commission "may prescribe for preserving the channel and providing for the flow of water therein to safeguard the public against danger from the waters impounded or affected by such structures." And it is also vested with authority to direct the removal or repair of any such structure, when the "public safety shall so require." But, apart from structural security, these provisions obviously bestow the incidental power necessary to subserve the general statutory objectives, and not one to the exclusion of the others; and that authority is, by the same token, circumscribed by those considerations.

And so, the purity of the state's potable water supply is of necessity a pre-eminent factor in the valid exercise of the powers thus conferred upon the commission. The legislature, by this enactment, recognizes that the safeguarding of such water sources and streams against pollution is a primary

function of government. The toll in health, and life itself, of disease-laden waters devoted to potable uses is immeasurable. And the economic waste, to say nothing of the grave individual consequences of such contamination, is likewise incalculable. Assuming, but by no means conceding, that the letter of the statute is ambiguous, it is implicit therein that qualitative as well as quantitative considerations shall govern the commission in the discharge of the duties laid upon it. And the former plainly have dominance. The commission may not issue a permit otherwise within its sphere, if the exercise of the authority thereby conferred will in all human likelihood result in pollution endangering the public health. Potability is not to be of secondary significance. A contrary construction would render abortive in a major particular the state economy expressed in the statute. It would obviously not tend to the "economic and prudent" development of such waters for "public use."

This statute is, on well settled principles, to be liberally construed to advance its beneficent policy. While the commission's jurisdiction is special and limited, it possesses such powers as by fair implication and intendment are incident to the authority expressly granted for the attainment of the general legislative policy. *P. Bronstein & Co., Inc.,* v. *Hoffman,* 117 *N. J. L.* 500; *Newark* v. *Civil Service Commission,* 115 *Id.* 26.

This construction in nowise conflicts with the provisions of section 3 of chapter 41 of the laws of 1899 (4 *Comp. Stat.* 1910, *p.* 5812), as amended by chapter 229 of the laws of 1918 (*Pamph. L., p.* 837), vesting in the state board of health "general supervision, with reference to their purity," of the sources of public water supplies for domestic use. Certainly, it was not the legislative design to eliminate this vital factor from the consideration of the water policy commission in the discharge of this particular function, and to correct the baneful consequences of a disregard of primary sanitary considerations through the processes of the board of health. This construction would be palpably distortive. Such procedural indirection, utterly opposed as it is to sound reason, is not to be imputed to the legislature in the absence of language

explicitly declaring that purpose. These statutes are in *pari materia,* and are to be construed together so as to effectuate the general legislative intent.

Thus it is that the commission was controlled in the instant case by a limitation of power not found in the statute. While it imposed certain conditions, "to the end (quoting the language of the permit) that the possibility of pollution of potable waters may be *minimized,*" it may well be that if it were conscious of the full sweep of its statutory power, it would have denied the application altogether. Contamination endandering the public health (such as is beyond the capacity of the natural purifying process contained in the water itself), even though reduced to a "minimum," is not justifiable in the service of a purely private interest. It is to be observed here that appellant adduced expert evidence tending to show the resultants of the contemplated physical changes would in a very real sense menace the public health, and that the testimony in contradiction introduced by respondents was found to have come from an unqualified witness. We are therefore required to remit the record for a rehearing and a determination of this issue in accordance with the correct principle.

As to appellant's contention that the erection of the proposed dam will substantially diminish its potable water supply, it suffices to say there was evidence that the avoidance of land losses in the adjoining marsh lands would offset the evaporation loss of fifty thousand gallons daily. There was evidence to the contrary. But it is the settled rule that findings of fact by the Supreme Court on conflicting evidence, or on uncontraverted evidence reasonably susceptible of conflicting inferences, are conclusive on appeal.

The judgment is accordingly reversed, and the cause remanded for further proceedings in conformity with this opinion.

*For affirmance*—None.

*For reversal*—The Chancellor, Chief Justice, Lloyd, Donges, Heher, Perskie, Hetfield, Dear, Wells, Wolfs-Keil, Rafferty, JJ.   11.