CHECKER, INCORPORATED, DBA CHECKER CAB COMPANY, PETITIONER, v. THE PUBLIC SERVICE COMMISSION OF NEVADA, REESE H. TAYLOR, JR., NOEL A. CLARK AND EVO A. GRANATA, RESPONDENTS.

VICTOR F. WHITTLESEA, DBA WHITTLESEA BLUE CAB COMPANY, PETITIONER–INTERVENOR, v. THE PUBLIC SERVICE COMMISSION OF NEVADA, REESE H. TAYLOR, JR., NOEL A. CLARK, AND EVO A. GRANATA, RESPONDENTS.

VICTOR F. WHITTLESEA, DBA WHITTLESEA BLUE CAB COMPANY, PETITIONER, v. THE HONORABLE LLEWELLYN YOUNG, THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA AND THE PUBLIC SERVICE COMMISSION OF NEVADA, RESPONDENTS.

UNION CAB CO., PETITIONER–INTERVENOR, v. THE PUB–LIC SERVICE COMMISSION OF NEVADA, REESE H. TAYLOR, JR., NOEL A. CLARK, AND EVO A. GRANATA; AND THE HONORABLE LLEWELLYN YOUNG AND THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, RESPOND–ENTS.

ACE CAB COMPANY AND YELLOW CAB COMPANY, AMICI CURIAE.

CAB EMPLOYEES, AUTOMOTIVE WORKERS AND WAREHOUSEMEN LOCAL NO. 881, AMICUS CURIAE.

Nos. 5651 and 5670

November 8, 1968                    446 P.2d 981

*E. M. Gunderson,* of Las Vegas, for Petitioner Checker, Incorporated, dba Checker Cab Company.

*Hilbrecht & Jones,* of Las Vegas, for Petitioner Victor F. Whittlesea, dba Whittlesea Blue Cab Company.

*Bell & Morris,* of Las Vegas, for Petitioner Union Cab Co.

*Harvey Dickerson,* Attorney General, and *John Sheehan,* Deputy Attorney General, for Respondents.

*Gabe Hoffenberg,* of Las Vegas, Amicus Curiae on behalf of Ace Cab Company and Yellow Cab Company.

*I. R. Ashleman, II,* of Las Vegas, Amicus Curiae on behalf of Cab Employees, Automotive Workers and Warehousemen Local No. 881.

## OPINION

By the Court, MOWBRAY, J.:

This is an original application by Checker, Incorporated, dba Checker Cab Company and Victor F. Whittlesea dba Whittlesea Blue Cab Company in certiorari to review an order of the Public Service Commission of Nevada dated June 3, 1968. The applicants contend that the entry of the June 3 order, which bears upon the number of taxicabs they and other cab companies may operate in Clark County, was in excess of the Commission's jurisdiction and is void. We agree.

The Commission's order of June 3 was the last in a series of orders commencing in December 1966 issued by the Commission and the Eighth Judicial District Court concerning the allocation of taxicabs in Clark County. Because of the confusion that has resulted from these orders and counterorders, it is imperative that the powers and responsibilities of the Commission be clarified, to the end that the taxicab industry, which plays a vital role in the economy of Clark County, be properly controlled and regulated.

1.    A threshold issue for our determination is whether the Public Service Commission of Nevada has the power to allocate the number of taxicabs operated by any holder of an unlimited certificate of public convenience and necessity. We hold that it does.

NRS 706.150[1] vests the Public Service Commission with the power and authority to supervise and regulate every common motor carrier of property and passengers *in all matters* on the highways of this State. Our Legislature has declared taxicab motor carriers as common carriers within the meaning of the public utilities laws of the State. NRS 706.250.[2] A public utility has been defined as any partnership, company, or association owning or operating automobiles engaged in transporting persons, for hire as common carriers. NRS 704.020 (1)(b).[3]

The purpose and intent of the Legislature in granting the Commission the power to regulate and to promote safe, adequate, and efficient service is specifically set forth in NRS 706.130, as follows:

"1.   It is hereby declared to be the purpose and policy of the legislature in enacting this chapter:

"(a) To confer upon the commission the power and authority and to make it the duty of the commission to supervise and

---

[1]NRS 706.150.   "Licensing of motor carriers by department; supervision, regulation by commission; applicability of other common carrier laws to motor carriers.

"1.   The department is hereby vested with the power and authority to and it shall license, and the commission is hereby vested with the power and authority to and it shall supervise and regulate every common motor carrier of property and of passengers in this state in all matters affecting the relationship between such carriers and the traveling and shipping public over and along the public highways of this state.

"2.   All laws relating to the powers, duties, authority and jurisdiction of the commission over common carriers are hereby made applicable to all such motor carriers except as otherwise specifically provided in NRS 706.010 to 706.700, inclusive."

[2]NRS 706.250.   "Certain carriers, brokers declared to be common carriers affected with public interest.   All common motor carriers of property, common motor carriers of passengers, brokers, taxicab motor carriers and motor convoy carriers are hereby declared:

"1.   To be common carriers within the meaning of the public utility laws of this state; and

"2.   To be affected with a public interest, and subject to NRS 706.010 to 706.720, inclusive, and to the laws of this state, including the regulation of all rates, charges and services now in force or that hereafter may be enacted, pertaining to public utilities and common carriers as far as applicable, and not in conflict herewith."

[3]NRS 704.020.   " 'Public utility' defined.

"1.   As used in this chapter, 'public utility' shall mean and embrace:
"* * *.

"(b) Any person, partnership, corporation, company or association owning or operating automobiles, auto trucks or other self-propelled vehicles engaged in transporting persons or property for hire over and along the highways of this state as common carriers."

regulate the common and contractor motor carrying of property and passengers for hire, and to regulate for licensing purposes the private motor carrying of property when used for private commercial enterprises on the public highways of this state, and to confer upon the department the power and authority to license all motor carriers, so as to relieve the existing and all future undue burdens on such highways arising by reason of the use of such highways by motor vehicles in a gainful occupation thereon;

"(b) To provide for reasonable compensation for the use of such highways in such gainful occupations, and enable the State of Nevada, by a utilization of the license fees, to provide more fully for the proper construction, maintenance and repair thereof, and thereby protect the safety and welfare of the traveling and shipping public in their use of the highways; and

"(c) To provide for fair and impartial regulation, to promote safe, adequate, economical and efficient service and foster sound economic conditions in motor transportation, and to encourage the establishment and maintenance of reasonable charges for such transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices.

"2. All of the provisions of this chapter shall be administered and enforced with a view to carrying out the declaration of policy contained in subsection 1."

The Legislature has also granted police power to the Public Service Commission for the enforcement of the Motor Vehicle Carriers Act.[4]

In Reo Bus Lines Co. v. Southern Bus Line Co., 272 S.W. 18, 20 (Ky. 1925), the court said:

"Public highways are public property, established, constructed, and maintained at public expense—for public use, and naturally fall under governmental control.

"* * *.

"Clearly, these companies have no vested or inherent right in the highways, and their unrestrained use thereof is equivalent

---

[4]NRS 706.210. "Enforcement by commission, inspectors; inspectors may carry firearms.

"1. The commission and its inspectors shall:

"(a) Enforce all rules and regulations of the commission and the department pertaining to this chapter.

"(b) Assist in the enforcement of all laws pertaining to the registration of motor vehicles.

"2. *The commission and its inspectors shall have police power for the enforcement of chapter 704 of NRS and this chapter, and laws pertaining to the registration of motor vehicles.*" (Emphasis added.)

to an appropriation of public property for private use, and it is within the power of the Legislature to prohibit this use or to prescribe the terms upon which it may be exercised."

In Yellow Cab & Baggage Co. v. Publix Cars, 253 N.W. 80, 84 (Neb. 1934), the court held: "The object in requiring such certificates [of public convenience and necessity] is not only to protect those already occupying the field in their investment, but to protect the public as well. Unreasonable and unwarranted competition might be carried to the extent that it would not only injure and jeopardize the property of those operating the utilities, but might even result in destroying them. Such a result might be disastrous to the interests of the public."

Oscar L. Pond, in volume 3 of the fourth and last edition (1932) of his "A Treatise on the Law of Public Utilities," discusses the subject of the regulation of public utilities and motor vehicle carriers by the State. He says, in sections 754 and 755:

"§ 754. Right of state to regulate use of its streets and highways.—The power of the state thus to regulate the use of its public thoroughfares is as fully established and generally recognized as the police power itself upon which it is founded. And as it includes the power to prohibit, the conditions of its exercise and enjoyment are subject to the broadest restrictions and regulations consistent with equality and other constitutional property rights. In fact few legal propositions are more fully and firmly established than the right of the state in the exercise of its police power to regulate or prohibit the use of its streets and highways as places of private business, or as the chief instrumentality of conducting such business as that of operating motor vehicle systems for profit.

"* * *.

§ 755. Regulation for public good.—The power to prohibit includes the power to regulate even to the extent of prohibition, and the reasonableness of the conditions of regulation may only be questioned in the light of constitutional provisions and limitations imposed upon the legislature. As no one has the inherent right to use the streets and public thoroughfares as a place wherein to conduct a private business, permission so to use them may be afforded certain parties, but always subject to the right to regulate and control their use in the interest of the public and for the common good of all. The public safety and the general business policy of providing public service are logical and necessary questions to consider in determining the nature and extent and in defining the conditions of public regulation and control of motor vehicles operating as common carriers."

The Supreme Court of Utah held, in McCarthy v. Public Serv. Comm'n, 77 P.2d 331 (Utah 1938), that the Legislature may regulate, in the public interest, common motor carriers. At page 337, the court said:

"Every such permit, every act of transportation, tends to produce competition for business, and increased activity to get and control business. But competition is not, in itself and always, a benefit to the public or in the public interest; not any more than is monopoly always in the public interest. Rather, it lies in a medium between the two. As well said in a recent case, People's Transit Co. v. Henshaw, 8 Cir., 20 F.2d 87, at page 90:

" 'The results of such competition, where there is not sufficient business to sustain all of the competitors, is that a season of experience causes all or some to drop out or compels the purchase of competitors (usually at exaggerated amounts), thus causing an increase of capital expenditure of the purchasers upon which the charges to the public must be based and thereby increased.

" 'These considerations, and others, amply justify differences to protect and preserve the existing permanent system. No new system has a legal right to destroy such existing system and have the public at its mercy. The public welfare is not served, but harmed thereby. The public may protect itself against such results. Nor can any theory of free competition change this situation. Competition is recognized and encouraged for the sole reason that it is supposed to result in the public good. But competition is not necessarily unrestrainable. It cannot be allowed to harm the very public it was designed to protect and aid. It may be restrained for the public welfare just the same as monopoly may be restrained or as competition may be left unrestrained. The test in each instance is the public good. Where the restraint upon competition is for the public good, it is sustainable just as restraint upon freedom of action by the individual is valid where for the public good. Such is the basis of and the reason for the entire police power.' "

Applicants contend that even if the Commission has the power to regulate the taxicab industry, it has not been given the power to allocate the number of cabs among the holders of certificates of public convenience and necessity, for the reason that the power of allocation is not specifically mentioned in the statute granting the Commission the power to regulate in all matters. We do not agree.

It is the universal rule of statutory construction that wherever a power is conferred by statute, everything necessary

to carry out the power and make it effectual and complete will be implied. Koelling v. Board of Trustees, 146 N.W.2d 284 (Iowa 1966).

As the court said in Juzek v. Hackensack Water Co., 225 A.2d 335, 342 (N.J. 1966):

"The grant of an express power is always attended by the incidental authority fairly and reasonably necessary or appropriate to make it effective. Cammarata v. Essex County Park Comm'n, 26 N.J. 404, 140 A.2d 397 (1958); 3 Sutherland, Statutory Construction § 5402 (3d ed. 1943). That which is clearly implied, is as much a part of the law as that which is expressed. Giles v. Gassert, 23 N.J. 22, 127 A.2d 161 (1956); State v. DeMeo, 20 N.J. 1, 118 A.2d 1, 56 A.L.R.2d 905 (1955); State v. Lanza, 27 N.J. 516, 143 A.2d 571 (1958), appeal dismissed, 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed. 2d 350 (1959), rehearing denied 359 U.S. 932, 79 S.Ct. 606, 3 L.Ed.2d 634 (1959); Brandon v. Montclair, 124 N.J.L. 135, 11 A.2d 304 (Sup.Ct. 1940), affirmed 125 N.J.L. 367, 15 A.2d 598 (E. & A. 1940); Jersey City v. State Water Policy Comm'n, 118 N.J.L. 72, 191 A. 456 (E. & A. 1936); 82 C.J.S. Statutes § 327 (1953)."

We conclude that the power to regulate in all matters gives the Public Service Commission the power and indeed the duty, where the need exists in the interest of the public good, to allocate taxicabs.

2. The inception of the instant controversy was an order issued by the Public Service Commission on December 14, 1966. At that time the Commission assumed authority to allocate taxicabs among competing carriers operating in Clark County. That order followed a duly noticed hearing at which all interested carriers appeared and presented their contentions. Thereafter followed a series of court adjudications and ex parte Commission orders, culminating in the Commission's order of June 3, 1968, the validity of which is challenged by this proceeding in certiorari. We turn to a brief consideration of those later court and Commission orders.

On January 10, 1968, a district court entered an order in a habeas corpus proceeding instituted by Mirin and Chenoweth, who had been arrested for operating too many taxicabs, in violation of the county allotment of taxicabs. The court in that proceeding ruled, inter alia, that the Public Service Commission lacked authority to allocate taxicabs in Clark County.

Apparently because of the district court ruling, the Public

Service Commission on January 15, 1968, suspended its prior order of December 14, 1966. This was done ex parte.

On March 27, 1968, in another separate civil action instituted by Mirin and Chenoweth, the district court in Clark County enjoined the County Commissioners of that county from attempting to allocate taxicabs among competing carriers, and ruled that the power to allocate resided with the Public Service Commission rather than with the County Commissioners.

Because of that court ruling, the Public Service Commission on March 29, 1968, reinstated its allocation order of December 14, 1966. This order was entered ex parte.

Mirin and Chenoweth were again arrested in May 1968 and commenced another habeas corpus proceeding. The district court granted their petition for relief and designated the number of taxicabs which all competing carriers could operate in Clark County.

Finally, on June 3, 1968, the Public Service Commission entered a new order of allocation, based mainly upon the district court allocation of May 27, 1968. The June 3 order was also entered ex parte.

The court allocation of May 27, 1968, cannot stand, since all interested, competing carriers were not parties to that litigation and the court was without power to adjudicate their interests.

3. With regard to the orders of the Public Service Commission, an examination of the record before us discloses that, with the exception of the order entered by the Commission on December 14, 1966, all orders of the Commission were entered either without notice or without hearing, and therefore are void. We hold that, when the Public Service Commission exercises its power of allocation, such as in the instant case, it may do so only after a full hearing duly noticed, where all parties have had an opportunity to appear.

When the Commission allocates the number of taxicabs that a company may operate in a given area, that order not only affects the property rights of the companies involved, but also affects their revenue-producing capacity. It is a well recognized principle of administrative law that notice and an opportunity to be heard must be given before such an order may be entered.

This view is expressed in NRS 233B.060, a section of the Nevada Administrative Procedure Act, which provides:

"1. Prior to the adoption, amendment or repeal of any regulation, the agency shall give at least 20 days' notice of its intended action.

"2. The notice shall:

"(a) Include a statement of either the terms or substance of the proposed regulation or a description of the subjects and issues involved, and of the time when, the place where, and the manner in which, interested persons may present their views thereon.

"(b) Be mailed to all persons who have requested in writing that they be placed upon a mailing list, which shall be kept by the agency for such purpose.

"3. All interested persons shall be afforded a reasonable opportunity to submit data, views or arguments, orally or in writing. With respect to substantive regulations, opportunity for oral hearing must be granted if requested by any interested person who will be directly affected by the proposed regulation. The agency shall consider fully all written and oral submissions respecting the proposed regulation.

"4. If an agency finds that an emergency exists, and such a finding is concurred in by the governor by written endorsement on the original copy of a proposed regulation, a regulation may be adopted and become effective immediately upon its being filed in the office of the secretary of state. A regulation so adopted may be effective for a period of not longer than 120 days, but the adoption of an identical regulation under subsections 1 to 3, inclusive, is not precluded.

"5. No regulation adopted after July 1, 1965, is valid unless adopted in substantial compliance with this section, but no objection to any regulation on the ground of noncompliance with the procedural requirements of this section may be made more than 2 years after its effective date. Regulations in effect on July 1, 1965, shall continue in effect until amended or repealed in accordance with the provisions of this chapter, if an original and two copies are deposited with the secretary of state on or before July 1, 1965.

"6. Upon adoption of a regulation, the agency, if requested to do so by an interested person, either prior to adoption or within 30 days thereafter, shall issue a concise statement of the principal reasons for and against its adoption, and incorporate therein its reason for overruling the consideration urged against its adoption."

In addition to the provisions of the Nevada Administrative

Procedure Act, the Rules of Practice and Procedure adopted by the Public Service Commission of Nevada on July 1, 1961, provide for hearings and notice.[5]

"4.1    Rights of Parties

"At any hearing, all parties named in the preceding rule, except interested parties, shall be entitled to enter an appearance, to introduce evidence, examine and cross-examine witnesses, make arguments, and generally participate in the conduct of the proceeding. Interested parties who are or may be directly and substantially affected by the proceeding may enter an appearance, introduce evidence and, subject to the discretion of the Commission, may otherwise participate in the conduct of the proceeding.

"* * *.

"4.3    Representation of Parties

"Appearances and representation of parties shall be made as follows:

"(a) A party shall be entitled to be heard in person or by his attorney;

"* * *.

"9.1    Place and Time

"Hearings will be held before one or more Commissioners. Notice of the place, date, and hour of the hearing will be served at least ten (10) days before the time set therefor. Hearings will be held in the State Office Building, Carson City, Nevada, or at such other place in the State as may be designated in the notice of hearing.

"9.2    Publication of Notice of Hearings

"All hearings required by the Public Service Commission of Nevada must be noticed by publication and mailing. The notice shall be in the following form:

"NOTICE

"Notice is hereby given that the hearing in the matter of................
................................................. will be held in ................................................
Title and cause of action                          Name of city and address
on ........................................... at ...........................................
              Date                                   Time

"All interested parties may appear and be heard.

"The notice shall be published one time in an ad not less than one (1) column by three (3) inches, with black border on all sides, and not less than ten (10) days prior to the day fixed for said hearing in one newspaper of general circulation published in each county wherein patrons or customers of said applicant will be affected by the application. If no newspaper of general circulation is published in any such county, then the notice may be published in any newspaper of general circulation which is located in any county which adjoins the county where patrons or customers therein reside.

"Copies of the notice shall also be mailed to all city clerks and county clerks of each county or city wherein patrons or customers affected by the application reside, and such other parties as designated by the Commission.

"Affidavits of publication and of mailing shall be filed with the Public Service Commission of Nevada at or prior to the time of initial hearing.

All notices of hearing shall be mailed by the applicant. All costs of mailing and publications shall be paid by applicant."

The Commission cannot act without notice and a reasonable opportunity to be heard and must act within constitutional limits. Carroll v. Public Util. Comm'n, 207 A.2d 278 (Conn. 1964).

As the court said in McCormick v. Pennsylvania Pub. Util. Comm'n, 30 A.2d 327, 329 (Pa.App. 1943):

"We concede that it is the duty of the administrative boards to hold fair and open hearings and to give notice so that those interested may have an opportunity to be heard and the 'rudiments of fair play' be observed."

The Supreme Court of the United States has ruled, in Ohio Bell Tel. Co. v. Public Util. Comm'n, 301 U.S. 292, 304 (1937):

"Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints. *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), supra* [294 U.S. 63], p. 70; *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 2),* 294 U.S. 79; *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U.S. 287, 304. Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' (*St. Joseph Stock Yards Co.* v. *United States,* 298 U.S. 38, 73) of a fair and open hearing be maintained in its integrity. *Morgan* v. *United States,* 298 U.S. 468, 480, 481; *Interstate Commerce Comm'n* v. *Louisville & N. R. Co., supra* [227 U.S. 88]. The right to such a hearing is one of 'the rudiments of fair play' (*Chicago, M. & St. P. Ry. Co.* v. *Polt,* 232 U.S. 165, 168) assured to every litigant by the Fourteenth Amendment as a minimal requirement. *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), (No. 2), supra; Brinkerhoff-Faris Co.* v. *Hill,* 281 U.S. 673, 682. Cf. *Norwegian Nitrogen Co.* v. *United States, supra* [288 U.S. 294]. There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored."

4. In summary, therefore, we hold that the power to regulate includes the power to allocate the number of taxicabs serving an area, and when that need in the public interest exists, the Commission has the duty to do so. We conclude that the

Commission's order entered on June 3 is void for want of jurisdiction, as are the orders of the Commission entered after its order entered in December 1966, at which time adequate notice was given and a full hearing afforded all interested parties.

We therefore rule that the allocation order of the Public Service Commission of December 14, 1966, is valid and has not been superseded by the subsequent ex parte orders of that Commission. However, since the taxicab carriers in Clark County have relied upon such invalid ex parte orders of the Commission, we direct the Commission to hold another hearing within a reasonable time to consider the allocation of taxicabs within that county, and to grant to all certified carriers the full opportunity to be heard.

THOMPSON, C. J., COLLINS, ZENOFF, and BATJER, JJ., concur.