## TONDELAYO S. J. JACKSON TURNER AND KENNETH TURNER, APPELLANTS, v. ELIAS SAKA, RESPONDENT.

No. 7220

February 4, 1974            518 P.2d 608

[Rehearing denied March 6, 1974]

---

[5]NRS 178.598: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

*Peter L. Flangas,* of Las Vegas, for Appellants.

*Robert N. Peccole,* of Las Vegas, and *Joel D. Siegal,* of Newark, N.J., for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

The mother of two "illegitimate" children here challenges an order of our district court which honored an *ex parte* New Jersey court order as a matter of "comity," and on that basis granted the father "temporary" custody through a writ of

habeas corpus.[1] In our view, the New Jersey court's order is not entitled to "comity," because it was entered under circumstances offensive to our understanding of procedural due process. Hence, we reverse with instructions to dismiss the father's petition. We also deny an application the father has filed in this court, asking us to stay adoption proceedings in the court below.

From pleadings filed in our district court, it seems that about 1965 respondent Saka, a married man in his forties, commenced a relationship with appellant Tondelayo (Jackson) Turner, seventeen, which resulted in the birth of a girl in 1966, and a boy in 1967. For disputed periods of time, Tondelayo left the children with Saka and his wife in New Jersey. Ultimately, she met and married appellant Kenneth Turner in Nevada. Then, apparently, Mrs. Turner felt able to care for her children. Her husband desired to adopt them. Together, they journeyed to New Jersey, recovered possession of the children on December 26, 1972, and returned with them to Nevada.

On January 3, more than a week later, Saka and his wife filed a "Verified Complaint" in the Superior Court for Monmouth County, New Jersey, purporting to institute a "civil action" entitled: "ELIAS SAKA and SOLANGE SAKA, his wife, Plaintiffs, vs. KENNETH TURNER and TONDELAYO S. J. JACKSON TURNER, his wife, Defendants." In addition to rather vague allegations made on "information and belief" which apparently were intended to show Mrs. Turner's bad character, the complaint's "first count" recited that having "abandoned" her children to the Sakas, she thereafter had "fraudulently" regained their possession and, with Kenneth Turner, had "illegally" removed them from New Jersey, contrary to their best interests. The "second count" alleged that, as a result, the Turners were "guilty of the tort of fraud and deceit herein." The "third count" incorporated prior averments, with the further allegation that "[t]his cruel abuse of the children by reason of their false imprisonment has caused plaintiffs considerable anguish, pain and suffering and is contrary to the best interests of the children." The prayer asked (a) permanent care and custody; (b) temporary care and custody pending determination of the action; (c) immediate return of the

---

[1]Our district court's order is appealable. NRAP 3A; Dean v. Kimbrough, 88 Nev. 102, 492 P.2d 988 (1972). Pending appeal, the writ has been stayed.

children; (d) a permanent injunction against taking the children; (e) a temporary injunction; and (f) damages, costs and attorneys' fees.

Also on January 3, with the ostensible justification that an immediate emergency existed, the Sakas' counsel induced the New Jersey court to execute an "Order to Show Cause," based on assertions set forth in the Sakas' complaint and in affidavits filed therewith.[2] Entered *ex parte* without any hearing or notice whatever, this "Order to Show Cause" purportedly required the Turners to deliver the children to Saka in New Jersey "immediately," enjoined them from taking the children from Saka's custody, and directed them to show cause on January 26 why such relief "should not remain in full force and effect pending the final determination by this Court of the matter set forth in the Complaint herein."[3] The "Order to Show

---

[2] As set forth later, we believe that even as presented to the New Jersey court, the circumstances of the case reflected no emergency of sufficient proportions to justify entry of this *ex parte* order. Moreover, it appears the Sakas' New Jersey counsel omitted to reveal facts a court might well wish to take into account in determining whether, indeed, an immediate threat existed to the well-being of the children in question. In oral argument to us, counsel acknowledged knowing that Mrs. Turner's husband was Dr. Kenneth Turner, who has been a physician in Las Vegas for a number of years. Counsel also acknowledged that a friendly relationship had prevailed between Saka and Dr. Turner, that Saka had introduced the Turners and indeed had been the "best man" at their wedding. In the documents counsel prepared to induce the New Jersey court to enter its *ex parte* order, however, he revealed none of this, and even avoided intimating Dr. Turner's professional status to the court, by alluding to him as "Mr. Turner."

In passing we also note, only to illustrate the dangers of deciding facts *ex parte*, and not intending to engage in the practice ourselves, that the documents Saka's New Jersey counsel presented to the New Jersey court may also have been inaccurate in depicting Saka as a pillar of his community. Our file contains a copy of a police officer's affidavit, originally prepared to obtain a warrant for Saka's arrest after he attempted to take the children from the Turners by force, in company with a local prostitute and a reputed thug. That affidavit, brought to our attention as part of the Turners' opposition to an application by Saka for dissolution of our district court's stay order, recites: "It should also be noted that ELIAS SAKA aka LEWIS SAKA has an extensive arrest record dating from 1939 to 1969, and for a convicted person for Theft in an Interstate Commerce, . . ."

[3] "ORDERED that defendants, Kenneth Turner and Tondelayo S. J. Jackson Turner, their agents and servants, be and they are hereby directed to return said children immediately to the actual care and custody of plaintiff Elias Saka at the residence of Mr. Saka and his wife, Solange Saka, at 83 Poplar Avenue, Deal, New Jersey pending a

Cause" also purported to require the Turners to answer the complaint,[4] and to grant them leave to seek dissolution or modification of the *ex parte* order.[5]

On January 4, copies of the "Order to Show Cause" were delivered to the Turners, together with copies of the Sakas' "Verified Complaint." Then, on January 8, Saka's "Petition for Writ of Habeas Corpus" was filed in our Eighth Judicial District Court, alleging Saka legally entitled to the children's custody by virtue of the "Order to Show Cause."[6] Our district court's master calendar judge ordered the Turners to file a

---

determination by this Court of the return day of this Order to Show Cause; and it is further

"ORDERED that the defendants, their agents and servants, be and they are hereby enjoined and restrained from taking said children from plaintiff Elias Saka's custody without the order of this Court, and from in anywise threatening or planning so to do pending said determination by this Court on the return day herein; and it is further

"ORDERED that defendants show cause before the Superior Court of New Jersey, Chancery Division on the 26th day of January, 1973 at 9:00 o'clock in the forenoon at the second floor of the Monmouth County Court House in the Borough of Freehold, County of Monmouth and State of New Jersey, why the defendants should not be enjoined and restrained in accordance with the demands in the said Complaint and more particularly, why the relief granted above should not remain in full force and effect pending the final determination by this Court of the matter set forth in the Complaint herein, . . ."

[4]"ORDERED that defendants are required to serve upon Hellring, Lindeman & Landau, Esqs., whose address is 1180 Raymond Boulevard, Newark, New Jersey 07102, Attorneys for plaintiffs, an Answer to the Complaint within thirty-five (35) days after service of this Order to Show Cause, exclusive of the day of service and that said defendants are required to file their Answer and proof of service in duplicate, with the Clerk of the Superior Court, State House Annex, Trenton, New Jersey, . . ."

[5]"ORDERED that defendants shall have leave to move to dissolve or modify the relief herein imposed upon not more than two (2) days' notice; . . ."

[6]After alleging facts concerning the children's birth, supposed "abandonment," and "deceitful" repossession, the petition recited:

"7.  Upon obtaining the removal of the said minor children from Petitioner's home, TONDELAYO S. J. JACKSON TURNER and her huband, KENNETH TURNER, removed the two minor children from the State of New Jersey to Clark County, Nevada, where said minor children are presently being held against their will and in violation of a New Jersey Court Order."

Thereafter, the petition recited details of the entry and "service" of the "Order to Show Cause," and the Turners' supposed violation of it. The petition revealed no clear theory for Saka's claim to the children, except that the New Jersey court had granted him their custody by its *ex parte* order. In response to the Turners' contentions that our district court erred in ruling without an evidentiary hearing, his New Jersey

return to Saka's petition, which they did January 10, denying allegations concerning Mrs. Turner's character, supposed "abandonment" of the children, and "deceitful" methods of recovering them. In addition, the Turners' counsel filed legal Points and Authorities, contending that the New Jersey court's order was void for want of jurisdiction. Without treating that contention, on January 23 our district court foreclosed an evidentiary hearing and, relying principally on Lyerla v. Ramsay, 82 Nev. 250, 415 P.2d 623 (1966), enforced the New Jersey court's order on the basis of "comity."

We believe our district court erred in failing to address the threshold issue of jurisdiction.

1. We do not deem Lyerla v. Ramsay, cited above, to be controlling here. In that case, we held Nevada properly could ignore a Kansas order which purported to grant a father full custody of a minor child, in derogation of a binding Nevada order entered shortly before.[7] Discussion of "comity" was unnecessary to our decision. See: 82 Nev. at 254, 415 P.2d at 625.

More important, in Lyerla v. Ramsay, we prefaced our discussion of "full faith and credit" and of "comity" with the

counsel advised us, in essence, that Saka's habeas petition was grounded solely on the *ex parte* order. In oral argument counsel stated:

"The ancient writ can have two purposes. You can go into a state and use habeas corpus to obtain a final determination on custody, if you want to, or you can bring a complaint to determine custody. This is not what we did. . . . All we did is, consistent with all the authorities and cases, is to use the writ of habeas corpus—and drafted it very carefully to make sure that we were using it properly—was to have the infants released from their improper, from the way that they were improperly held at the time, which is the traditional notion of habeas corpus. And they were being improperly held at that time because of an order from the State of New Jersey, from a court of competent jurisdiction. . . ."

We therefore assume that Saka's habeas petition was based on no grounds other than that his counsel now claims; hence, it presents no factual issue requiring remand for an evidentiary hearing.

[7] In this regard, we said:

"Yet there is nothing in the record to show that a change of circumstances occurred between July 6, 1964, when Nevada ruled, and July 28, 1964, when Kansas vested full custody in the father. Therefore, it is clear that Kansas did not give the Nevada order the protection of full faith and credit. The very circumstances Kansas considered had been litigated and decided in Nevada just 22 days earlier.

"If full faith is to be accorded a child custody order, Kansas was without power to change custody on July 28, 1964, absent a showing of changed circumstances. That showing was not made. Therefore, we are free to disregard the Kansas order. [Citations omitted.]" 82 Nev. at 253, 415 P.2d at 624–625.

observation that "[a]t the various times involved each court had due process jurisdiction to rule, as both parents appeared and the child was present within the state where a change in custody was sought." 82 Nev. at 251, 415 P.2d at 623. Here, when the New Jersey court entered its *ex parte* order, the facts were otherwise.

2. In Nevada and, it seems, under New Jersey law, custodial rights as to "illegitimate" children repose in the mother from the time of birth, although such rights may be judicially terminated if she be proved unfit, and although both states permit the father to establish his paternity, and to have his parental obligations and visitation privileges declared.[8] The Turners contend that, with Mrs. Turner and her children in Nevada, the New Jersey court could not obtain jurisdiction

[8]A New Jersey statute declares:

"The mother of an illegitimate child, whether married or single, shall have the exclusive right to its custody and control and the putative father of such child shall have no right of custody, control or access to such child without the mother's consent. If, however, it is proved that the mother is unfit to have the custody and control of such child, the Superior Court or any other court which may have jurisdiction in the premises may make any order touching the custody or control of such child which might heretofore have been made.

"This section is intended to be declaratory of the existing law upon this subject and it shall, under no circumstances, be construed as an implication that the rights of such a mother have hitherto been less than as herein above defined."

Thus, adoption of an "illegitimate" child based on the mother's consent is binding on the father. In Re T., 230 A.2d 526 (N.J.App.Div. 1967). However, it seems a father may bring an action to establish his paternity, and to have his parental obligations and visitation rights declared. R. v. F., 273 A.2d 808 (N.J. Juv. & Dom. Rel. Ct. 1971).

Although Nevada has not defined the custodial rights of unwed mothers so specifically as has New Jersey, we believe that here also such rights initially repose in the mother, from time of birth. Several Nevada statutes recognize that, at least until paternity is judicially determined, the mother of an "illegitimate" child is the prime repository of parental rights. Consent to adoption may be given by "[t]he mother only of a child born out of wedlock except that if parental rights have been established in a court of competent jurisdiction by the father of such a child, pursuant to NRS 41.530, his consent shall be required; . . ." NRS 127.040(c); cf. Flowers v. Scott, 88 Nev. 254, 495 P.2d 610 (1972). The mother and her heirs have the sole right to inherit from an "illegitimate" child who dies intestate, unless the child is acknowledged or legitimatized before its death. NRS 134.170; NRS 134.180. In addition, in the case of any child of tender years, the mother is the preferred custodian unless she is unfit. Peavey v. Peavey, 85 Nev. 571, 460 P.2d 110 (1969).

See also: Z v. A, 320 N.Y.S.2d 997 (N.Y.App.Div. 1971).

to affect her parental rights. Cf. May v. Anderson, 345 U.S. 528 (1953). To the contrary, Saka contends that New Jersey could obtain *in personam* jurisdiction over the Turners, because New Jersey has a "long-arm" statute applicable to the "counts" in the Sakas' "Verified Complaint." Also, the Sakas contend that, inasmuch as the children previously were present there, New Jersey could assume *in rem* jurisdiction over them to provide for their well-being, even if out-of-state process would not provide such *in personam* jurisdiction over the Turners as would justify a money judgment. We need not resolve these questions, which would impel us to search for the New Jersey "long-arm" statute alluded to by counsel, to consider its applicability to "counts" in the "Verified Complaint," to ponder the constitutionality of applying it in these facts, and to reflect about the suggested *"in rem"* power of the New Jersey court over Mrs. Turner's children. Here, our decision may rest on the fact that the Sakas gave Mrs. Turner no notice whatever, before asking the New Jersey court to enter its *ex parte* "Order to Show Cause," divesting her "temporarily" of her parental rights.

For present purposes, we may assume the Sakas' "Verified Complaint" states a cause of action, concerning which New Jersey has authorized service of process elsewhere; that, if such action be *in personam,* the Turners' venture into New Jersey, to retrieve the children, was sufficient "contact" with that state to justify personal service in Nevada; or that the children's prior presence provides a basis for jurisdiction *in rem.* Assuming all this, still we must consider whether the New Jersey court, on the basis of the *ex parte* application and showing made by Saka's counsel, could enter the order it did, prior to and not based on any service of process whatever, mandating Mrs. Turner to deliver her children to Saka, 3,000 miles from her home in Nevada. If that *ex parte* order was contrary to procedural due process, as we understand that concept, then we believe we must hold that our district court erred in honoring such order as a matter of "comity."

3. Regarding the question thus posed, decisions of this court, holdings of the United States Supreme Court, and (from what Saka's counsel tell us) New Jersey law also, all impel the conclusion that *ex parte* entry of the "Order to Show Cause" was impermissible. In Maheu v. District Court, 88 Nev. 26, 493 P.2d 709 (1972), we recently reiterated how this court historically has viewed *ex parte* orders:

"For a century, our settled law has been that any 'special' motion involving judicial discretion that affects the rights of

another, as contrasted to motions 'of course,' must be made on notice even where no rule expressly requires notice to obtain the particular order sought, except only when this requirement is altered to meet extraordinary situations such as those concerned in NRCP 65(b). Pratt v. Rice, 7 Nev. 123 (1871); NRCP 6(d). It is also fundamental that although an order's subject matter would lie within the court's jurisdiction if properly applied for, it is void if entered without required notice. Our authorities establishing this principle are as old as Wilde v. Wilde, 2 Nev. 306 (1866), and as recent as Reno Raceway, Inc. v. Sierra Paving, Inc., 87 Nev. 619, 492 P.2d 127 (1971). It makes no difference that a void order may concern a matter committed to the court's discretion, such as 'discovery,' regarding which the court might have granted protective orders had a proper application been made. Cf. Checker, Inc. v. Public Serv. Commn., 84 Nev. 623, 446 P.2d 981 (1968); Cf. Ray v. Stecher, 79 Nev. 304, 383 P.2d 372 (1963); cf. Whitney v. District Court, 68 Nev. 176, 227 P.2d 960 (1951); cf. Abell v. District Court, 58 Nev. 89, 71 P.2d 111 (1937)." 88 Nev. at 34, 493 P.2d at 714.[9]

These Nevada standards of procedural due process seem consistent with pronouncements of the United States Supreme Court. Most of that tribunal's recent decisions on the subject are cited and discussed in Fuentes v. Shevin, 407 U.S. 67 (1972), in which the Court said:

"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' " Id. at 80. "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." Id. at 81. "This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone." Id. at 82. "That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived . . . except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until

---

[9]In regard to *ex parte* orders generally, and the circumstances under which notice and hearing properly may be dispensed with or deferred, see especially: Pratt v. Rice, 7 Nev. 123 (1871).

With regard specifically to *ex parte* orders affecting established custody rights, see: Abell v. District Court, 58 Nev. 89, 71 P.2d 111 (1937); Whitney v. District Court, 68 Nev. 176, 227 P.2d 960 (1951); and NRS 125.060.

after the event." Id. at 82; emphasis in original. "[I]t is now well settled that a temporary, nonfinal deprivation . . . is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." Id. at 84–85. "The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations . . ." Id. at 86. "[U]ltimate right to continued possession was, of course, in dispute. . . . But . . . that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." Id. at 87. "There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing. . . . These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing." Id. at 90–91.

Saka's counsel has not suggested to us that New Jersey has less stringent standards; indeed, counsel concedes New Jersey's rule concerning restraining orders is couched in substantially the same language as Nevada Rule of Civil Procedure 65.[10]

---

[10]NRCP 65(b) provides, inter alia:

*"Temporary Restraining Order; Notice; Hearing; Duration.* A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required. . . . On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require."

New Jersey Court Rule 4:52–1(a) provides in part:

". . . The order to show cause shall not, however, include any temporary restraints against the defendant unless he has either been given notice of the application or consents thereto or it appears from specific facts shown by affidavit or verified complaint that immediate and irreparable damage will probably result to the plaintiff before notice can be served or informally given and a hearing had thereon. . . ."

A Comment in *Gann Law Books' annotated edition of the 1969 New Jersey Court Rules* indicates that, therefore, not only must the probable "immediate and irreparable damage" be substantial, but "because of the extremity of the remedy of a restraint without notice, the revised rule requires that the restraint not be granted ex parte if immediate informal notice can be given." We note that the Turners

Thus, we turn to consider whether the "Verified Complaint" and affidavits presented to the New Jersey court set forth specific facts clearly demonstrating a real danger of immediate and irreparable injury either to the children, or to Saka's claimed rights, of proportions sufficiently grave to justify entry of the particular order in question, without notice.

In our view, no such showing was made. Instead, it clearly appeared that the Turners had an established residence in Las Vegas, where the children had been more than a week. Although Saka's affidavit recited hearsay that the children had been seen crying, it presented no substantial basis for believing they were uncared for, or would be subject to any enduring injury or trauma because of being with their mother. True, the documents attempted to show Mrs. Turner was of poor character, referring to alleged prior promiscuity, and to a violent altercation with another juvenile which supposedly caused Mrs. Turner's protective detention at age 15; but we doubt New Jersey would consider those facts, even if ultimately proved, present evidence of Mrs. Turner's "unfitness." Cf. Ex Parte Malley, 25 A.2d 630 (N.J. Ch. 1942). In any event, we have no doubt that the creative prose of Saka's New Jersey counsel fell short of establishing such an emergency as would justify ordering a mother, with *prima facie* legal right to her children, to deliver them to a putative father some 3,000 miles away. On the facts of this case, we believe such counsel could not properly dispense with notice and proceed *ex parte*.

4. In view of the foregoing, we consider the New Jersey court's "Order to Show Cause" void for want of notice insofar

---

were not given even informal notice although the Sakas' application was not presented to the New Jersey court for eight days after the Turners departed with the children, and although the Turners' whereabouts were so well known that they could be served in Nevada with the *ex parte* order the day following its entry in New Jersey.

In oral argument before this court, Saka's New Jersey counsel alluded to (but did not cite) another New Jersey Rule, which he says is similar to our NRCP 65(f). Our rule provides:

"*When Inapplicable.* This rule is not applicable to suits for divorce, alimony, separate maintenance or custody of children. In such suits, the court may make prohibitive or mandatory orders, with or without notice or bond, as may be just."

Although NRCP 65(f) may be read to envision somewhat greater flexibility and less formality in domestic matters than in other litigation, still we do not read it as dispensing with the requirement that there be either notice or a showing of necessity before existing custody rights are disturbed. An order entered without one or the other simply is not "just."

as it purported to divest Mrs. Turner "temporarily" (i.e. indefinitely) of custody of her children. Cf. In re Groen, 60 P. 123 (Wash. 1900). Of course, we would not permit our court to enforce an unconstitutional order. Moreover, even assuming the New Jersey court could constitutionally proceed without notice as it did, we would decline to enforce that order as a matter of "comity"; for we consider the entry of an *ex parte* order so radical, on a showing so minimal, to offend sound public policy. Cf. Fantony v. Fantony, 122 A.2d 593, 596–597 (N.J. 1956).

The order appealed from is reversed; the district court is instructed to dismiss Saka's petition for writ of habeas corpus; respondent Saka's application for a stay of adoption proceedings is denied. In accord with NRS 18.060, appellants are allowed their costs on appeal, upon proper filing of a cost bill.

THOMPSON, C. J., and MOWBRAY, BATJER, and ZENOFF, JJ., concur.